Catherine M. BURWELL et al., Plaintiffs,

v.

EASTERN AIR LINES, INC., et al., Defendants.

Sharyn D. CLAYTON, Plaintiff,

v.

EASTERN AIR LINES, INC., Defendant.

Civ. A. Nos. 74–0418–R, 75–0688–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Sept. 6, 1978.

Robert B. Wallace, Alexandria, Va., Jay L. Westbrook, Surrey, Karasik & Morse, Washington, D.C., Stephen L. Spitz, The Lawyers' Committee for Civil Rights Under Law, Washington, D.C., David R. Cashdan, Roisman, Kessler & Cashdan, Washington, D.C., John C. Falkenberry, Charles A. Powell, III, Birmingham, Ala., for plaintiffs.

Henry L. Marsh, III, Richmond, Va., Joseph Ray Terry, Jr., Atlanta, Ga., for proposed intervenors Ina Federal and Andrea Bergen.

Hunton, Williams, Gay & Gibson, Francis V. Lowden, Jr., Paul M. Thompson, Christine H. Perdue, A. W. VanderMeer, Jr., Richmond, Va., for Eastern Airlines.

W. H. Cabell Venable, Richmond, Va., Asher W. Schwartz, New York City, for Local 550 of the Airline Stewards and Stewardesses Ass'n and Local 553 of the Transport Workers Union of America.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, female employees of the defendant, Eastern Air Lines, Inc. (Eastern), bring this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, to redress alleged sexually discriminatory employment practices. Local 550 of the Airline Stewards and Stewardesses Association (local 550) and Local 553 of the Transport Workers Union of America (TWU Local 553) are also named as defendants. The plaintiffs seek declaratory, injunctive and monetary relief. Jurisdiction is attained pursuant to 42 U.S.C. § 2000e–5(f). A trial has been held on the issue of liability and the Court is

prepared to issue its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. *Parties*

(1) The action styled *Burwell et al. v. Eastern Air Lines, Inc., et al.* was brought by Catherine Burwell and Jean Proctor against Eastern and the two union defendants alleging sex discrimination in the maintenance and administration of the maternity and benefits policies applicable to Eastern flight attendants.

(2) Sharyn Clayton filed a similar action against Eastern in the United States District Court for the Northern District of Alabama.

(3) Plaintiff Burwell, who has been an Eastern flight attendant for approximately twelve years, had had the following maternity history since 1970:

 (a) Burwell notified Eastern approximately May 13, 1970 that she was pregnant. She gave birth on October 7, 1970.

 (b) Burwell again became pregnant in late 1974. That pregnancy terminated in a miscarriage in November, 1974.

 (c) On April 8, 1976, Burwell again advised Eastern that she was pregnant. Her expected delivery date was mid-August, 1976.

(4) Plaintiff Proctor, who has been an Eastern flight attendant for approximately eleven years, has had the following maternity history since 1970:

 (a) Proctor notified Eastern approximately May 15, 1972 that she was pregnant. She gave birth on September 21, 1972.

 (b) Proctor notified Eastern approximately September 3, 1974 that she was again pregnant. She gave birth on January 28, 1975.

(5) The defendant Eastern is a Delaware corporation doing business in Virginia where it is engaged in the transportation of passengers across state lines. Eastern employs more than fifteen persons and has, at all times material to this action, been an employer engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(b), (g) and (h).

(6) Locals 550 and 553 (the Union) are labor organizations engaged in an industry affecting commerce and having more than fifteen members within the meaning of 42 U.S.C. § 2000e(d) and (e). At all times material hereto prior to June 1974, Local 550 was the recognized collective bargaining representative for all Eastern flight attendants. In June 1974, Local 553 was formed as a successor to Local 550 with respect to the employees of Eastern. Since June 1974, Local 553 has been the recognized collective bargaining representative for all Eastern flight attendants.

(7) The plaintiffs are and have been members of the Union at all times material to this litigation.

### B. *The Issues*

(8) At issue in this litigation is the legality of the various components of Eastern's maternity policy. Broadly speaking, the plaintiffs challenge: (a) the separate treatment of pregnancy under Eastern's Group Comprehensive Medical Insurance; (b) the exclusion of pregnancy from Eastern's paid sick leave policy and the impact of such exclusion on other conditions of employment; (c) the policy that pregnant flight attendants lose all accumulated seniority if they transfer to ground positions rather than taking maternity leave; (d) the time limits placed on guaranteed rights to reinstatement of flight attendants taking maternity leave and (e) the requirement that flight attendants must commence maternity leave immediately upon knowledge of pregnancy. The policies under attack are contained in a collective bargaining agreement entered into by Eastern and the Union.

### C. *Class Action*

(9) Upon motion of Eastern, the *Clayton* action was transferred from the Northern District of Alabama to the Eastern District of Virginia. The *Burwell* and *Clayton* ac-

tions were consolidated for all purposes by order of the Court dated January 27, 1976.

(10) Upon motion of Eastern, this litigation was certified a class action pursuant to Rule 23(b)(2), Fed.R.Civ.P. The class is defined as all female flight attendants employed by Eastern at any time since October 27, 1972, or who may be so employed in the future, and who are, were, or may in the future be subject to Eastern's maternity leave policy.

(11) Notices of the pendency of this action were mailed to all class members on November 10, 1975 and January 29, 1976. In addition, notices were posted for a period of twenty days at all places throughout the Eastern system where flight attendant notices are customarily posted.

(12) The plaintiffs have now moved the Court (a) to redefine the class to include ground employees and (b) to extend the time frame back to July 2, 1965. The Court would be inclined to include ground employees and to adopt a July 2, 1965 cutoff date if the request for class certification were being presented for the first time. *See Briggs v. Brown and Williamson Tobacco Corp.*, 414 F.Supp. 371, 377–378 (E.D.Va. 1976). At this late date, however, broadening the class in the requested manner would, in the Court's view, be inappropriate.

### D. *History of Eastern's Maternity Related Policies*

(13) Prior to 1973, Eastern refused to hire married persons for flight attendant positions. Between 1958 or 1959 and 1973, Eastern also limited employment of flight attendants exclusively to women. Accordingly, the impact of the "singles only" hiring policy fell primarily upon women. Prior to the mid-1960's, Eastern also maintained a policy of terminating female flight attendants who became married. This policy was never applied to male flight attendants.

(14) From 1931 until May 1, 1965, Eastern automatically terminated all flight attendants who became pregnant. This policy was modified in 1965 to give the Company the option to fire flight attendants who became pregnant. From March 21, 1970 to the present, Eastern's policy has been that flight attendants must commence unpaid maternity leave immediately upon knowledge of pregnancy. As part of this policy, flight attendants on mandatory maternity leave have guaranteed rights to reinstatement within ninety days after delivery under normal circumstances or within six months after delivery if the additional time is needed for medical reasons.

(15) From March 21, 1970 until April 26, 1973, it was Eastern's policy that flight attendants could not accrue seniority during mandatory maternity leave. As a result of collective bargaining between Eastern and the defendant Union, this policy was changed to allow accrual of seniority. Flight attendants whose seniority dates were adversely adjusted as a result of maternity leave occurring after July 1, 1972, could, upon request, have such seniority restored.

(16) On April 12, 1974, in connection with the settlement of *Healen v. Eastern Air Lines, Inc.*, Civil Action No. 1897 (N.D.Ga.), Eastern agreed to restore the seniority of any female flight attendant whose seniority had been adversely affected as a result of maternity leave occurring prior to July 1, 1972. At Atlanta, and perhaps at other bases, attendants who were identified as having taken maternity leave prior to July 1, 1972, were sent individual letters setting forth the facts of the *Healen* settlement and requesting that they respond in writing within sixty days, stating their name, employee number and dates of maternity leave. Eastern subsequently automatically restored all seniority for flight attendants at its Atlanta base, whether or not they responded to the individual letters explaining *Healen.*

(17) Although plaintiff Proctor did not accrue seniority during her maternity leave in 1972, and did not request restoration of seniority under either the 1973 contract change or the *Healen* settlement, Eastern nonetheless restored her seniority sometime

between January 1, 1974 and July 1, 1974. Mrs. Proctor lost no seniority during her 1974–1975 maternity leave.

### E. *Medical Insurance Plan*

(18) Eastern provides a Group Comprehensive Medical Insurance Plan for eligible flight attendants and pays 100% of the premiums for such coverage.

(19) Eastern's Group Comprehensive Medical Insurance Plan has provided at all relevant times herein the payment of 80% of all covered major medical expenses after the satisfaction of a $100 per person calendar year deductible.

(20) Eastern's Group Comprehensive Medical Insurance Plan provided and continues to provide for the payment of covered in-hospital expenses at the following rates: For March 21, 1970, through June 30, 1973—payment of the first $750 plus 80% of all additional covered expenses; from July 1, 1973, through July 31, 1974—payment of the first $1,200 plus 80% of all additional covered expenses; from August 1, 1974, through the present—payment of the first $1,500 plus 80% of all additional covered expenses.

(21) Under its medical insurance plan effective February 4, 1976, Eastern provides benefits for pregnancy expenses as follows: for normal deliveries, the plan will reimburse the first $300.00 of covered expenses, the employee will pay the next $300.00, and then 50% of all covered expenses over $600.00 will be reimbursed by the plan. For miscarriages and abortions, the plan will reimburse the first $200.00 of covered expenses, the employee will pay the next $200.00, and then 50% of all covered expenses over $400.00 will be reimbursed by the plan. Although the cost of a normal pregnancy will vary in different parts of the country, the average pregnancy at the present time costs approximately $1,000.00.

(22) From approximately 1968 until February 4, 1976, Eastern's Group Comprehensive Medical Insurance Plan provided benefits for pregnancy expenses (hospital and obstetrical) as follows: normal delivery—up to a maximum of $250.00; miscarriage or abortion—up to a maximum of $150.00.

(23) Eastern's Group Comprehensive Medical Insurance Plan provides the following limitations on coverage:

(a) Payments for out-patient treatment of mental and nervous disorders limited to 50% of covered expense or $10 per visit, whichever is less, with a maximum of 50 visits per year and $50,000 lifetime;

(b) No payments for services or supplies in connection with routine physical examinations or not reasonably necessary for the medical care of the patient's sickness or injury;

(c) No payment for services or supplies resulting from an occupational injury or illness for which Workmen's Compensation benefits will be available;

(d) No payment for services or supplies furnished by or for any government;

(e) No payment for services or supplies received as a result of an act of war;

(f) No payment for cosmetic surgery unless for an accident suffered while covered;

(g) No payment for examinations to determine need for adjustment of glasses or hearing aid;

(h) No payment for treatment of periodontal or periapical disease or any condition involving teeth except treatment for a fractured jaw or for an accidental injury to natural teeth;

(i) No payment for treatment of weak, strained, flat, unstable or unbalanced feet, or for metatarsalgia or bunions except open cutting operations, or for corns, calluses, or toenails unless prescribed by a physician;

(j) No payment for nursing, speech therapy, or physiotherapy rendered by the employee or by the spouse, child, brother, sister or parent of an employee or an employee's spouse;

(k) No payment for anything not prescribed or ordered by a physician;

(*l*) No payment for vaccinations or innoculations for flu, polio, smallpox, diptheria, etc.;

(m) No payment for eyeglasses or orthopedic shoes;

(n) No payment for the difference between a semi-private room rate and a private room rate;

(o) No payment for charges that are not reasonable, customary, necessary and prescribed by a physician for treatment of any non-occupational injury or illness;

(p) Payment for hospital room and board charges during the first seven (7) days after birth of children of covered employees; and

(q) Payment for up to 80% of the reasonable and customary fee for required surgery.

(24) At all times material to this litigation, Eastern's medical benefits plan has provided major medical benefits for the following complications of pregnancy: Hyperemsis Gravidarum (pernicious vomiting); eclampsia of pregnancy (toxemia with convulsions), Caesarean sections after six months of pregnancy; intra-abdominal surgery after pregnancy terminates; and surgery for extra-uterine pregnancy. Such benefits are equivalent to those for any other covered illness or injury.

(25) As of June 1974, Eastern estimated that it would cost an additional $5.72 per flight attendant per month, or $68.84 per flight attendant per year, to provide medical benefits for normal pregnancies on the same basis as regular medical benefits. The cost of the 1976 increase in benefits for miscarriages, abortions and normal deliveries was estimated to be $67,000 per year for flight attendants alone and $448,100 for all Eastern employees who received similar increases.

(26) Women comprise approximately 90% of the flight attendant group, and receive about 95% of the benefits paid out under the medical insurance plan.

### F. Sick Leave, Maternity Leave and Disability

(27) Eastern's employment benefits package is the product of negotiations between Eastern and the Union. The various policies are contained in the collective bargaining agreement. For the purposes of determining the eligibility for and extent of the various benefits, a distinction is made between active employees, i. e., those on the payroll, and inactive employees, i. e., those not on the payroll. Active employees include those actually working, those on paid sick leave, and those on vacation. Inactive employees include those on medical leave without pay (including short term and long term disability), those on personal or emergency leave, those on military leave, and those on maternity leave. In most material respects, the benefits afforded inactive flight attendants are equivalent to those afforded active flight attendants. In this litigation, the relevant comparison involves the benefits available to flight attendants on paid sick leave and those afforded flight attendants on maternity leave.

(28) Under the collective bargaining agreement, a flight attendant who is unable to make a scheduled flight because of an illness or injury is placed on sick leave. Flight attendants placed on sick leave continue to receive their base pay to the extent of accrued sick leave allowance and are considered active employees.

(29) Sick leave allowance is accrued as follows: From October 9, 1967 through April 26, 1973, flight attendants accrued sick leave at a rate of 1⅙ days per month of active service to a maximum of 120 days accrued sick leave. Although flight attendants were not eligible for sick leave benefits during the first three months of active service, they accrued sick leave credit during that period. From April 26, 1973, until December 31, 1974, flight attendants accrued sick leave allowance at a rate of 2 hours per month during the first 6 months of active service. After six months of active service, flight attendants accrued sick leave allowance at the rate of 4½ hours per month for each month of active service up to a maximum of 400 hours. Effective January 1, 1975, flight attendants accrued sick leave allowance at the rate of 4½ hours per month for each month of active service to a maximum of 500 hours.

(30) Flight attendants who accumulate 300 or more hours of sick leave credit and

become sick, will, upon return to active duty, accumulate sick leave credits at the rate of 5½ hours per month rather than 4½ hours per month until their sick leave bank again equals the sick leave credits accrued when their sick leave began.

(31) Flight attendants on paid sick leave continue to accrue sick leave and vacation credits at the same rate that they would if on active employment. Flight attendants on maternity leave, however, accrue neither sick leave nor vacation leave.

(32) When plaintiff Burwell commenced her maternity leave on May 14, 1970, she had accrued 47 and ⅚ days of sick leave. Plaintiff Proctor had accrued 140 hours and 54 minutes of sick leave prior to the commencement of her maternity leave on May 15, 1972, and had accrued 58 hours and 55 minutes of sick leave when she began her maternity leave on September 3, 1974. Neither woman was permitted to apply her earned sick leave credits to her maternity leave.

(33) Eastern does not allow flight attendants to apply sick leave credits to leaves caused by the following conditions: (a) alcoholism or drinking problems; (b) drug addiction or drug problems; (c) intentionally self-inflicted injury or attempted suicide; (d) pregnancy; (e) cosmetic surgery or elective plastic surgery; or (f) routine physical examinations or doctor's appointments, unless the flight attendant can show that it is impossible to schedule appointments during non-working hours.

(34) Eastern allows the use of sick leave by flight attendants for the following conditions, among others: lung cancer, sterilization, hernia, psychiatric care, injury incurred in a sports activity, prostatitis or prostatectomy, injury incurred in an automobile accident, and vasectomy.

(35) While on paid sick leave, Eastern flight attendants may continue their Group Comprehensive Medical Insurance for the duration of their paid sick leave, and the company continues to pay 100% of the premium payments. Flight attendants on maternity leave (or other leave without pay) may continue coverage of the Group Comprehensive Medical Insurance Plan only by personally paying the required monthly contribution.

(36) Since 1961 or earlier, it has been Eastern's policy to provide, at no cost to employees, an accident and sickness plan for flight attendants who are unable to work because of non-occupational accident or sickness. Benefits under this sickness and accident plan range from $25.00 to $110.00 per week and are payable from the eighth day of disability or from the expiration of accumulated sick leave benefits, whichever is later, up to a maximum of 26 weeks for each disability period.

(37) Eastern has offered long-term disability insurance coverage to flight attendants since 1973. Coverage under the long-term disability plan is elective, and the premium costs are borne by the individual flight attendant.

(38) Flight attendants who take sick leave due to an injury or illness are eligible for paid sick leave only to the extent accrued. After exhaustion of paid sick leave, flight attendants are eligible for short-term accident and sickness benefits. They may then be eligible for long-term disability benefits under the elective plan, but only after exhaustion of the short-term plan and a six-month waiting period.

(39) Flight attendants who are on maternity leave of absence are not eligible for short-term disability plan benefits or long-term disability plan benefits.

(40) The short-term disability coverage plan excludes the following conditions: (a) injuries covered by workmen's compensation or similar legislation; (b) conditions for which the employee is not under regular care of a physician; and (c) pregnancy or its complications.

(41) The long-term disability plan excludes the following conditions: (a) intentional self-inflicted injury whether sane or insane; (b) injuries resulting from war or act of war; (c) willful misconduct or commission of a felony; (d) alcoholism unless the employee is hospitalized for rehabilitation; (e) drug addiction unless the employee

is hospitalized for rehabilitation; (f) pregnancy, child birth, or complications thereof; (g) injuries incurred while serving in the armed forces of this country or another country; (h) participation in a riot; and (i) injuries or sicknesses not being treated by a qualified physician.

(42) Leaves of absence for sickness or injury may extend for a maximum continuous period of three years. It has been Eastern's policy since March 21, 1970 that flight attendants on maternity leave must be available to return to service within ninety days following delivery unless additional time, not to exceed six months, is medically necessary.

(43) Seniority is defined in the collective bargaining agreement as the length of service with Eastern. Accrual of seniority is not dependent upon availability for flight duty. Seniority affects flight attendants regarding: (a) reductions in force; (b) recalls after furlough; (c) assignment or reassignment to bases; and (d) flying assignments within the bases.

(44) Active service is defined in the collective bargaining agreement as the time during which a flight attendant is available for flight duty, not including time on leave of absence in excess of thirty days, but including time on sick leave and vacation. The active service date is used for the following purposes: (a) to establish flight attendant seniority members; (b) to determine pay progression dates; (c) to determine vacation accrual; (d) to determine sick leave accrual; and (e) service awards.

(45) Flight attendants taking maternity leave retain active service credit throughout the leave and accrue active service for the first thirty days of leave. Flight attendants on paid sick leave continue to accrue active service for the duration of the paid sick leave.

(46) Plaintiff Proctor's active service date was adjusted 197 days on December 4, 1972 as a consequence of her maternity leave from May 15, 1972 through November 26, 1972. Her active service date was adjusted 237 days on May 5, 1975 as a consequence of her maternity leave from September 3, 1974 through April 28, 1975. Plaintiff Burwell's active service date was adjusted 230 days on December 31, 1970 as a consequence of her maternity leave from May 13, 1970 through December 28, 1970.

(47) As discussed previously, Eastern in the past did not allow flight attendants to accrue seniority while on maternity leave. This policy was changed through collective bargaining and the settlement of a lawsuit, and is not in issue here.

(48) It is Eastern's policy to provide employees on active status with pleasure travel privileges on Eastern flights (and other airlines with whom Eastern has reciprocal arrangements). These privileges are granted on a space-available basis subject to certain restrictions and payment of a service charge.

(49) Employees on paid sick leave or on vacation are considered "active employees," and hence are entitled to travel passes. Employees on maternity leave are not considered active employees and, accordingly, are ineligible for travel passes.

(50) It is the policy of Eastern to compel flight attendants to commence maternity leave immediately upon knowledge of pregnancy. Because of this policy, Eastern does not provide flight attendants with maternity uniforms for in-flight use and makes no allowances for weight gain due to pregnancy in administering its personal appearance policy.

(51) The collective bargaining agreement contains a provision by which a flight attendant forfeits all seniority rights accrued as a flight attendant should he or she transfer to a position not directly related to flight attendant work. An exception is made for transfers caused by physical incapacity, sickness or injury, but pregnancy has not been deemed to fall within this exception. This policy makes temporary transfers to ground positions highly impractical and undesirable for most flight attendants on maternity leave.

### G. Basis for the Maternity Program

(52) Eastern offers the following reasons for excluding pregnancy from sick leave

and disability plans and for distinguishing between pregnancy and other physical conditions under the insurance plans:

(a) Pregnancy is neither an illness nor an injury within the categories of risk which the insurance and sick leave plans were intended to cover;

(b) There is an element of voluntarism involved in pregnancy which does not apply in the same degree to other temporarily disabling physical conditions;

(c) The limits placed upon maternity benefits reflect a rational economic decision of the Company and the female-dominated Union on how best to allocate limited resources. Increased maternity benefits have not been necessitated by Union pressure or by competition within the airline industry;

(d) Payment of sick leave or disability benefits for pregnancy would amount to a form of severance pay not available to men or non-pregnant females because a significantly higher percentage of flight attendants fail to return from maternity leave than from medical leave; and

(e) The cost of providing sick pay and short-term disability for pregnant flight attendants and other pregnant Eastern employees would be excessive.

## H. *Mandatory Maternity Leave*

(53) From March 21, 1970 until the present, Eastern has maintained a policy of requiring flight attendants to commence unpaid maternity leave immediately upon learning that they are pregnant. The flight attendant has a guaranteed right of reinstatement within ninety days after delivery or, if additional leave time is warranted by the flight attendant's medical condition, within six months after delivery.

(54) Maternity leave is the only form of mandatory leave without pay.

(55) Pregnancy is the only physical condition which automatically precludes a flight attendant from flying. Effective December 4, 1975, flight attendants with diabetes controlled by insulin, and certain epileptic flight attendants, have been permitted to fly despite evidence that such flight attend-

ants are more likely to be rendered unable to perform their duties than pregnant flight attendants.

(56) Eastern has never conducted or caused to be conducted any study or analysis regarding the effects of pregnancy upon a flight attendant or her ability to satisfactorily perform her duties. Prior to the inception of this litigation, Eastern has never sought or received any professional or expert opinion concerning the ability of a pregnant flight attendant to continue her work.

(57) The evidence clearly establishes that Eastern makes virtually no effort to police its forced maternity leave policy. Eastern relies upon the individual flight attendant to advise the company of pregnancy. Other than voluntary compliance, visual detection is the only means by which Eastern attempts to enforce its policy.

(58) Eastern has no specific guidelines concerning the physical ability of a flight attendant to function in his or her job. No oral or written instructions are provided in the course of a flight attendant's training regarding physical conditions which should cause a flight attendant not to fly. There are no procedures for regular medical check-ups or examinations of flight attendants. In short, the judgment as to whether a flight attendant is sufficiently healthy to fly is left almost entirely to the good sense of the individual flight attendant. The record is devoid of any evidence indicating that pregnant flight attendants do not voluntarily abstain from work when physically unable to perform their duties.

(59) Although it is Eastern's position that pregnant flight attendants constitute a safety liability at any stage of pregnancy, most women do not discover they are pregnant until at least seven weeks after conception, and many women do not discover that they are pregnant until the tenth week of pregnancy. Even assuming voluntary compliance with the policy, therefore, many women would continue to work as flight attendants during part of the period in which Eastern contends their condition poses a safety risk.

(60) It is common knowledge among Eastern's management that most flight attendants continue to work after they become aware of their pregnancy. Most flight attendants continue to work through at least the first trimester of pregnancy. Many, including the named plaintiffs, have continued flying through their fifth month of pregnancy. One flight attendant was seven months pregnant prior to commencing maternity leave.

(61) Surveys conducted by Trans World Airlines (TWA) and Western Airlines also indicate that flight attendants continue flying well into pregnancy. One court has found that flight attendants for National Airlines, on the average, continue to fly through the first three months of pregnancy, and that many fly well into their fifth month. *In re National Airlines, Inc., Maternity Leave Practices and Flight Attendant Weight Program Litigation,* 434 F.Supp. 249, 258 (S.D.Fla.1977).

(62) Eastern has never disciplined a flight attendant who continued flying after knowledge of pregnancy. Indeed, Eastern has never even attempted to determine whether a flight attendant violated its rule, even though such a determination could be readily accomplished, in most cases, by comparing the commencement date of maternity leave with the date of delivery.

(63) The Court has considered the testimony of several experts concerning pregnancy and its impact upon a flight attendant's ability to perform both normal and emergency duties. The depositions of Dr. Earl T. Carter, Director of the Preventive Medicine Section of the Mayo Clinic, and Dr. David Decker, Director of Obstetrics and Gynecology for the Mayo Clinic, were offered as evidence. Dr. Carter is an expert in the field of aviation medicine and serves as a medical advisor to Northwest Airlines. Dr. Decker is an expert in obstetrics and gynecology.

(64) Dr. Andre E. Hellegars testified as an expert witness for the plaintiffs in the fields of obstetrics and gynecology. Dr.

William Whaley provided expert testimony concerning hematology and aerospace medicine.[1]

(65) It was the consensus view of these experts that pregnancy, in a vast majority of instances, is an entirely healthy condition which becomes disabling only near the commencement of labor. The usual duration of such disability is approximately six to eight weeks. It is common medical practice to permit an expectant mother experiencing no complications to continue pursuing all of her normal activities, including her work, until shortly before the commencement of labor. The American College of Obstetricians and Gynecologists endorses this view. All of the obstetricians and gynecologists who testified in this case permit their patients, absent complications, to continue horseback riding, skiing and other vigorous sports during pregnancy. Thus, it is the generally accepted medical practice to allow pregnant women to continue normal working schedules until shortly before delivery provided they are not exposed to noxious elements such as intense radiation or dangerous chemicals. Indeed, Dr. Hellegars considered the loss of income and related stress which accompany an involuntary maternity leave to be a greater health risk to pregnant women in most instances than continued employment.

(66) Eastern's involuntary maternity leave policy obviously conflicts sharply with the generally accepted medical practice described above. Eastern maintains that the physiological changes associated with pregnancy coupled with the unique work environment of an aircraft cabin impair a pregnant flight attendant in satisfactorily discharging her responsibilities. Specifically, Eastern maintains that continued flying during pregnancy: (a) poses a danger to the fetus; (b) poses a danger to the pregnant flight attendant; and (c) compromises the safe operation of the aircraft because a pregnant flight attendant, in Eastern's view, is less able than her non-pregnant counterpart to perform her normal operational and emergency duties.

---

1. Although Dr. Whaley was not offered as an expert in the field of obstetrics and gynecology, the Court notes that he has published several articles in this field as it relates to hematology.

(67) The Federal Aviation Administration (FAA), which promulgates extensive safety regulations applicable to commercial airlines, does not require mandatory maternity leave for pregnant flight attendants.

(68) The Air Transport Association (ATA), an association of scheduled air carriers, including Eastern, organized a Medical Committee which is composed of medical directors of member airlines. The ATA Medical Committee is on record as favoring an involuntary maternity leave policy such as Eastern's. The Committee has recognized, however, that this position derives no support from existing medical statistics. Nevertheless, all ATA members, with the exception of Northwest Airlines, have adopted policies similar to Eastern's.[2]

(69) Pregnancy generates physiological changes in a woman's body and produces certain side effects which, Eastern maintains, impair her functioning as a flight attendant. Two dramatic changes are an increase in blood volume and an increase in cardiac output. The blood volume of an expectant mother can increase by as much as 40–45%. Simultaneously, the percentage of red cells per unit of blood decreases. The resulting decrease in hemoglobin concentration is termed physiological anemia and is a normal condition in pregnant women; it means that greater amounts of oxygen exist in the blood, but in a less concentrated form. Cardiac output also increases during pregnancy. The combination of these factors means that more blood and oxygen are available for the body's organs at any given time than are available to a non-pregnant person.

(70) A pregnant woman also experiences an expansion in her abdominal area, a loosening of the pelvic joints, and increased girth. The rate at which the fetus and uterus grow is basically exponential, increasing most rapidly during the later stages of pregnancy. Prior to the twentieth week of pregnancy, these changes have little or no effect on a woman. The rate of growth after the twentieth week varies from woman to woman. The combination

**2.** A substantial evidentiary problem arose following trial concerning a document which plaintiffs referred to as the "destroy after reading" memorandum, so designated because those words are written on it. This document, authored by Mr. W. R. Arnold of the Air Lines Industrial Relations ("AIR") Conference, purports to summarize the positions of the medical directors of a number of airlines, including Dr. Serrano of Eastern, regarding the ability of flight attendants to perform their assigned inflight tasks during various stages of pregnancy. The memorandum is based on a report given by Dr. L. G. Lederar, Medical Director of American Air Lines, at a January 6, 1975 meeting of the AIR Conference and Air Transport Association ("ATA") "Task Force on Maternity Problems Involving Cabin Attendants." The portion of the "destroy after reading" memorandum purporting to summarize Eastern's medical position is characterized by counsel for plaintiffs as contradicting Eastern's official policy regarding mandatory maternity leave. Plaintiffs have offered the document as an admission by a party-opponent under Rule 801(d)(2)(c) of the Federal Rules of Evidence, and Eastern has objected.

The Court is of the view that Eastern's objection is well taken. Despite plaintiffs' exhaustive post trial discovery, plaintiffs were never able to connect the "destroy after reading" memorandum to Eastern sufficiently to bring it within Rule 801(d)(2)(c). The position attributed by Mr. Arnold to Eastern was not based on any statement by any employee of Eastern; it was based only on Dr. Lederar's report at the ATA Task Force meeting. Dr. Lederar's report, in turn, was not premised on any written statement of Eastern's position, and did not purport to quote anyone at Eastern. Dr. Lederar's understanding of Eastern's position was no more than an "implication" which he gleaned from various conversations with unspecified Eastern representatives at unspecified times and places. Even assuming that these earlier conversations were with Dr. Serrano, who was fully authorized to speak for Eastern, the chain from Dr. Serrano through Dr. Lederar to Mr. Arnold's memorandum suffers too many weak links to satisfy Rule 801(d)(2)(c). Plaintiffs' contention that *Kingsley v. Baker/Beech-Nut Corp.*, 546 F.2d 1136, 1140–41 (5th Cir. 1977), supports their position is in the Court's view inaccurate, for in that case an overheard telephone conversation was held admissible under 801(d)(2)(c) only because the Court found the connection between the admission made and the person testifying to it to be immediate and direct.

Certain portions of the "destroy after reading" memorandum referring to airlines other than Eastern appear to be better documented, but in the Court's view are merely cumulative of other evidence adduced at trial, and will not be admitted.

of abdominal expansion and increased girth decreases a woman's agility. Consequently, many women become more accident-prone during the later stages of pregnancy. By the end of the twenty-eighth week, these physiological changes significantly affect the agility and mobility of virtually all women.

(71) Many pregnant women complain of fatigue, loss of strength, fainting and morning sickness during various stages of their pregnancy. The degree to which a pregnant woman becomes fatigued during pregnancy is largely dependent upon her general state of health and the level of activity to which she is normally accustomed. An active woman who continues her employment during her pregnancy is less likely than an inactive, non-working woman to become fatigued during early stages of pregnancy.

(72) Fainting occurs most frequently when a person, pregnant, or non-pregnant, stands suddenly after being in a fixed position, and least frequently when a person is on her feet moving around. Fainting in pregnant women is most common in the very early weeks and after the twenty-eighth week of pregnancy.

(73) Morning sickness or nausea affects at least 50% of all pregnant women. This condition is rarely disabling and can be ameliorated through diet regulation. Dr. Hellegars has observed that engaging in some activity such as work will take a pregnant woman's mind off of her nausea and thus lessen its effects.

(74) There were no empirical studies or hard data concerning the effects of continued work upon the unborn child of a flight attendant. Dr. Whaley conjectured that the natural physiological anemia of a pregnant woman coupled with the high altitude work environment and physical exertion accompanying the position could adversely affect the oxygen tension in the blood to the detriment of the fetus. It was further speculated that this decrease in oxygen tension could promote miscarriages and premature births. Dr. Whaley's theory has no widespread acceptance in the medical community, though it is deemed by many to be a matter worthy of investigation.

(75) Drs. Prichard and Hellegars were of the opinion that the increased blood volume and cardiac output associated with pregnancy insure that both the fetus and flight attendants receive sufficient amounts of oxygen.

(76) There was also testimony concerning the manner in which a fetus might be affected by a plane crash or by the rapid decompression and trauma sometimes associated with air turbulance. While a sudden decompression of the aircraft cabin would reduce the amount of available oxygen, the evidence shows that a fetus and its mother would be more likely to adjust to such conditions than non-pregnant persons. The superior anaerobic metabolism of the fetus accounts for this adaptability.

(77) It was speculated that the high altitude at which an aircraft flies increases a flight attendant's exposure to atmospheric radiation which could produce birth defects. There was no empirical data to substantiate this hypothesis.

(78) In sum, the evidence that continued flying by a pregnant flight attendant constitutes a danger to the unborn child is largely speculative and unsupported by current medical opinion.

(79) Pregnant and non-pregnant flight attendants share certain inherent occupational risks. Sudden decompression and severe turbulence threaten all flight attendants. Fortunately, the incidents of emergency decompression are exceedingly rare and result in very few injuries. Air turbulence, while common, is rarely of sufficient intensity to cause injury. From 1970 through 1974, statistics covering 2.5 million completed flights reveal only three reports of serious injuries to flight attendants due to air turbulence.

(80) A pregnant flight attendant faces two risks that her non-pregnant counterpart does not share: miscarriage and premature delivery. A miscarriage is defined as the termination of a pregnancy before the twentieth week. A premature delivery is the termination of a pregnancy after the twentieth week but prior to full term.

(81) Spontaneous abortion prior to implantation is never incapacitating and most

women who abort prior to implantation do not know they are pregnant until the spontaneous abortion occurs. Approximately 10% of all implanted pregnancies will terminate in miscarriages; 90% of these will occur within the first thirteen weeks.

(82) Miscarriages beyond the sixth week of pregnancy are usually disabling. Although it is impossible to predict a miscarriage with certainty, there are reliable indicators such as spotting or bleeding. A flight attendant who is not spotting when she begins a flight has little danger of miscarrying prior to the completion of that flight.

(83) Premature deliveries are usually unpredictable and are disabling when they occur. However, many doctors recommend the consumption of alcohol—an item found in bountiful quantities on Eastern aircrafts—to slow or halt a premature birth once it is underway.

(84) The following is a list of flight attendant responsibilities prepared, in part, by Eastern in conjunction with the ATA Medical Committee:

I. *Normal Operational Duties*

Lifting—up to 25 pounds regularly, 50 pounds occasionally.

Prolonged walking.

Prolonged standing.

Repeated bending and stooping.

Occasional overhead reaching.

Kneeling.

Pushing and pulling.

Ability to withstand recurrent training.

Assisting "extra care" passengers.

*Emergency Duties*

Hemlich maneuver.

Lift out emergency window exits—weight, 30 pounds each exit.

During evacuation: carry children, push passengers down slides, crawl over seats to reach exits and/or passengers, administer first aid.

Carry out overwater ditching and survival procedures.

Assist with life raft—weight, 120 pounds.

Assist passengers into raft.

Operate emergency equipment for flight attendant's own use.

Mouth-to-mouth resuscitation.

Psychological reactions to hijacking and in-flight emergencies.

II. *Working Conditions*

Cabin pressurized to 5,000 feet.

Exposed to jet engine noise.

Irregular schedules.

Occasionally long working hours (up to fourteen continuous hours).

Temperature extremes (depending upon time of year and location).

Light to severe turbulence on occasion.

(85) Recurrent training, required by Federal Aviation Administration regulations, is an annual retraining program devoted to a review and updating of safety procedures. Several members of the plaintiff class have successfully completed Eastern's recurrent training while pregnant.

(86) The record is devoid of any evidence suggesting that early stages of pregnancy affect the ability of a flight attendant to perform her normal operational duties. The physical exertion required of a flight attendant in a non-emergency situation is no greater than that required of a homemaker. One flight attendant who has experience in both capacities indicated that it was far easier to perform her routine duties as a flight attendant while pregnant than it was to tend to her house.

(87) The emergency duties are necessarily more demanding mentally and physically than the normal operational duties. FAA regulations require that an aircraft be evacuated of passengers in ninety seconds. Many of the escape hatches are narrow. Removing the emergency windows and doors and deploying the life raft require strength and skill. Flight attendants must also direct the passengers and provide any necessary instructions. In short, a flight attendant must be quick thinking, agile and mobile in emergency situations.

(88) Although Eastern's experts believed that a flight attendant should cease work immediately upon knowledge of pregnancy, they were frank to admit that there was

virtually no empirical evidence to support their position as to the first trimester of pregnancy. Dr. Serrano, Eastern's medical director, conceded in a letter to Eastern's General Counsel dated December 13, 1973, that medical and safety considerations did not justify forced maternity leave during the first trimester of pregnancy. In that letter, Dr. Serrano expressed agreement with another airline's recent decision to allow flight attendants to continue flying during their first trimester of pregnancy "since the reasons for denial for medical and/or safety considerations during this period of pregnancy are rather weak if at all present."[3]

(89) Eastern's justifications for its involuntary maternity leave policy were, in the Court's view, persuasively refuted by the plaintiff's experts. Drs. Pritchard and Hellegars, after reviewing a list of flight attendant duties and watching a movie prepared by Eastern demonstrating emergency procedures, unequivocally concluded that flight attendants experiencing normal pregnancies could perform both normal and emergency duties without difficulty through the twentieth week of pregnancy. These doctors were of the view that increased girth and abdominal expansion resulting in decreased agility are the key limiting factors for a pregnant flight attendant, but that these factors are generally insignificant until after the twentieth week. The Court finds the testimony of Drs. Pritchard and Hellegars to be convincing and harmonious with the prevailing current medical opinion.

(90) The discomforts of morning sickness, fatigue and fainting, as noted earlier, are primarily associated with very early or late stages of pregnancy. In addition to expert testimony and the testimony of many flight attendants, experience bears out that these conditions do not compromise the safe operation of an aircraft. It has been the experience of Eastern and other airlines (such as TWA and National Airlines) that many flight attendants continue to work through the first trimester. There is not a single instance in the record of a pregnant flight attendant becoming incapacitated because of nausea or fainting. The Director of Medical Services for TWA noted in a letter dated July 9, 1974 that TWA's experience with pregnant flight attendants supported the conclusion that the early months of pregnancy are not incompatible with the duties of a flight attendant.

(91) On February 1, 1973, Dr. Carter addressed the Obstetrics and Gynecology De-

---

**3.** A letter to Mr. Bell in its entirety reads as follows:

Attached is a copy of a response made to Dr. Lederar, Medical Director of American Airlines, regarding the flight status of pregnant flight attendants. Notice that American has changed their policy, allowing flight attendants to fly during their first trimester of pregnancy.

I tend to agree with Dr. Lederar since the reasons for denial for medical and/or other safety considerations during this period of pregnancy are rather weak, if at all present. However, I do certainly agree and strongly support the grounding of flight attendants once the uterus has sprung out of the pelvis and reached the abdominal cavity—that is, roughly, during the 14th to 16th week of pregnancy.

While Dr. Lederar's letter to Mr. Pascuito is quite comprehensive, I feel that the stronger medical and safety points for grounding flight attendants following the 16th week of pregnancy are:

Flight attendants are more prone to acute complications during this period (placenta preevia, abrupt placenta, etc.).

They shift their base of sustenation backwards and their line of gravity forward. This tends to compensate the weight of the abdo-

men at the front of the baby, making them clumsy in their movements and creating a large potential for in-flight accidents.

Women, as their pregnancy progresses, develop a keen maternal instinct which may, in case of an accident, cause them to seek protection for their unborn baby rather than to assist passengers during the crisis.

Evacuation procedures are extremely cumbersome during the last few months of pregnancy because of the additional weight in both the flight attendant and the previous mentioned change in the base of sustenation and the line of gravity.

I hope these comments will help you in some of the legal procedures that you are encountering in this area.

Julio R. Serrano, M.D.

Where Dr. Serrano's conclusions differ from those ultimately reached by the Court, his letter is highly significant, in the Court's view, because it shows that even Dr. Serrano, upon whom Eastern relied heavily to justify its policy, could articulate no medical or safety considerations to support Eastern's blanket policy of grounding all flight attendants immediately upon knowledge of pregancy.

partment of the Mayo Clinic concerning pregnant flight attendants. The duties of a flight attendant were discussed in great detail. The various effects of pregnancy such as morning sickness, fatigue, girth, etc. were considered. The consensus reached by the Mayo Clinic staff was that during the first trimester a flight attendant could perform all of her duties without difficulty; that during the second trimester a flight attendant's ability to perform her duties varied from individual to individual; and that during the third trimester a flight attendant should not work. This consensus provided the basis for the maternity policy adopted by Northwest Airlines in December 1973. In the years since 1973, during which Northwest has permitted pregnant flight attendants to continue working, there have been no miscarriages while on duty, no complaints with regard to performance of duties and no indication of increased injuries to passengers or flight attendants. The Northwest experience thus serves as empirical verification of the position of the plaintiffs' experts.

(92) While the dangers of miscarriages are real in every pregnancy, there is no acceptable evidence that the incidence of miscarriages is higher among working flight attendants than among other women. As previously indicated, the chances are minimal that a flight attendant who boards a flight without spotting will miscarry prior to completing the flight.

(93) The Court finds, in summary, that (a) through the twentieth week of pregnancy, substantially all pregnant flight attendants undergoing normal pregnancies can perform both their normal operational duties and their emergency duties as well as they normally can when not pregnant; (b) after the twentieth week of pregnancy, due primarily to decreased agility accompanying abdominal expansion and increased girth, the ability of pregnant flight attendants to discharge their in-flight responsibilities varies from individual to individual; and (c) after the twenty-eighth week of pregnancy, all or substantially all pregnant flight attendants can no longer perform their duties as well as they normally can when not pregnant.

### I. *The Union*

(94) At all times material to this action, the membership of the Union was at least 90% female, though several of its officers were male. Contracts were negotiated by Eastern with the Union in 1965, 1967, 1970, 1973 and 1974. The 1965 contract was negotiated prior to the effective date of Title VII.

(95) In its opening proposals for the 1967 contract, the Union introduced a proposal to eliminate Eastern's "no marriage" rule for female flight attendants. The Union also proposed a clause prohibiting discrimination on the basis of sex and age. Eastern refused to accept the non-discrimination clause. The Union did secure, however, a Letter of Agreement stating "Eastern will not consider marital status only as a reason for discharge of a flight attendant during the term of the new basic agreement." The Union made no proposals with respect to flight attendant maternity. The 1967 contract contained provisions explicitly recognizing Eastern's right to terminate pregnant flight attendants.

(96) During the negotiations leading to the 1970 contract, the Union proposed the adoption of maternity leave and the elimination of pregnancy as a basis for termination. The Union renewed its proposal for a non-discrimination clause with regard to sex and age. The Union was successful in obtaining maternity leave but Eastern again rejected the non-discrimination clause. The Union made no formal proposals concerning Eastern's policy of mandatory leaves of absence for pregnant flight attendants. No proposal was advanced to treat pregnancy in the same manner as other temporary disabilities with regard to benefits.

(97) In its opening proposals submitted in April, 1972 leading to the 1973 contract, the Union renewed its request for a non-discrimination clause and, for the first time, proposed that Eastern allow pregnant flight attendants to continue flying. On April 5, 1972, the EEOC Advisory Guidelines on

pregnancy were issued. One of the these guidelines, found at 29 C.F.R. § 1604.10(a), states that a "written . . . employment policy or practice which excludes from employment . . . employees because of pregnancy is in prima facie violation of Title VII." At the negotiating table, Union officials handed Eastern negotiators a copy of the EEOC guidelines and stated that they represented Union demands. The 1973 contract contained a non-discrimination clause, but Eastern rejected the Union proposals that pregnant flight attendants be permitted to continue flying after knowledge of pregnancy. Eastern also rejected Union demands that the EEOC guidelines be made part of the contract. The contract did contain a provision granting flight attendants maternity leave with retention and accrual of seniority rights retroactive to July 1, 1972.

(98) The Union was a party to the settlement agreement in *Healen v. Eastern Air Lines, supra,* which generated a settlement agreement providing that the accrual of seniority policy set forth in the collective bargaining agreement was to apply to pregnancies prior to July 1, 1972.

(99) In its opening proposals submitted during the negotiations for the 1974 contract, the Union presented a benefits package including medical insurance for normal pregnancies and miscarriages at a rate comparable to hospitalization for other disabilities, and 26 weeks of short-term disability eligibility for pregnancy. Eastern refused to accept this proposal and instead asserted its intention to comply with the then forthcoming decision of the United States Supreme Court in *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). The Union did not renew its 1972 demands.

(100) Since the promulgation of the EEOC guidelines in April 1972, the Union has taken the position that the guidelines have the force of law. Notwithstanding this position, the Union has signed several contracts which do not conform to these guidelines.

(101) The Union's proposals with regard to maternity policies were among the last items of the Union's demand to be withdrawn or settled. These issues were withdrawn or settled only upon the failure of active mediation by the National Mediation Board to persuade Eastern to accept the Union's proposals. Had the mediation efforts been unsuccessful in bringing about an agreement, a strike would have been the only means by which the Union could have attempted to secure acceptance of their proposals. A strike could not have been called for, however, without the approval of the Union membership. Due to a lack of widespread support for these issues within the Union membership, the Court is persuaded that a strike vote probably would not have been successful.

(102) Prior to negotiating each new contract with Eastern, the Union solicits and considers proposals from its members. Maternity related issues have never generated much support within the Union despite its 90–95% female composition.

(103) The Union has never filed a grievance, an EEOC complaint or a court action based upon or related to the allegedly illegal maternity practices of Eastern.

(104) In sum, the Union appears to have made some effort to secure through collective bargaining that which the plaintiffs seek in this Court. The Union has achieved limited success in altering some of Eastern's policies. These changes have been gradual in nature. For example, the Union sought to eliminate the "no marriage" rule before pushing for maternity benefits. The Union's efforts with respect to Eastern maternity policies have been less than vigorous, but this is not surprising in light of the small support these issues have generated within the Union. Given this dearth of support, the Union was not in a position to exert great pressure.

## II. CONCLUSIONS OF LAW

### A. *General Principles*

▮ The plaintiffs have the burden of establishing that the acts of which they complain constitute discrimination in viola-

tion of Title VII. *General Electric Co. v. Gilbert,* 429 U.S. 125, 137 n.14, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Only upon the showing of a prima facie case of discrimination does the burden shift to the defendant to justify the contested practices by a legitimate nondiscriminatory reason. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Unlike the plaintiff in an action arising under the Fifth or Fourteenth Amendments, a plaintiff in Title VII litigation may establish a prima facie case without regard to intent, upon proof that the effect of an otherwise facially neutral plan or classification is to discriminate against members of one class or another. *Compare General Electric Co. v. Gilbert, supra,* 429 U.S. at 137, 97 S.Ct. 401; *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) *with Village of Arlington Heights v. Metropolitan Housing Development,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). If the plaintiff fails to establish a prima facie case, or if a prima facie case is adequately rebutted by the defendant, the plaintiff can nonetheless prevail if she can prove that the contested practice is a pretext for illegal discrimination. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–05, 93 S.Ct. 1817. With the general framework in mind, the Court will turn to the specific practices in issue.

### 1. MEDICAL INSURANCE PLAN:

The issue of the medical insurance plan can, in light of the Supreme Court's pronouncements in *General Electric Co. v. Gilbert, supra,* be disposed of almost summarily. Under Eastern's Group Comprehensive Medical Insurance Plan, benefits paid for normal delivery are substantially lower than they would be if pregnancy were treated as any other condition requiring hospitalization. In *General Electric v. Gilbert, supra,* the Supreme Court held that exclusion of pregnancy from an employee's disability insurance plan does not violate § 703(a)(1) of Title VII[4] unless the exclusion of pregnancy from the insurance package has a discriminatory effect in the sense that the plan is "worth more to men than to women," 429 U.S. at 138, 97 S.Ct. at 409, or unless the exclusion of pregnancy benefits is a "mere pretext" for unlawful sex discrimination, *id* at 136, 97 S.Ct. 401. Plaintiffs in the instant case meet neither test.

With respect to the relative worth of the plan to men compared to women, the plaintiffs engaged in extensive post-trial discovery pursuant to the Court's order reopening the record in light of *Gilbert.* Despite this additional discovery, plaintiffs have expressed in their post-trial brief that they "do not believe there is a statistically significant disparity between benefits to male and female flight attendants" under Eastern's medical insurance plan. Thus, plaintiffs themselves recognize that they have failed to prove discriminatory effect under the standards of *Gilbert.*

Nevertheless, plaintiffs submit that the Court should evaluate Eastern's insurance program in light of its historical treatment of female flight attendants. Plaintiffs urge that this "bleak history of unrelenting antifamily pressure against Eastern's female employees" justifies a conclusion that the reduced benefits for pregnancy is a pretext for unlawful sex discrimination.

In the Court's view, the viability of plaintiff's argument in this regard is in serious question. Indeed, the Court is satisfied that Eastern's policy of providing less than

---

**4.** Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1) provides, in pertinent part, as follows:

(a) It shall be an unlawful employment practice for an employer—

(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

full coverage for pregnancy-related medical expenses is simply an economic decision concerning the allocation of limited financial resources. *See* Larson, *Sex Discrimination as to Maternity Benefits*, 1975 Duke L.J. 805, 818 (1976). Plaintiffs have offered nothing to dissuade the Court from this conclusion. While Eastern's tainted history might aid the Court in interpreting any relevant facts specifically relating to Eastern's insurance coverage, plaintiffs' recitation of that history standing alone is insufficient to prove pretext.

■ In summary, as plaintiffs have shown neither discriminatory effect nor pretext, the Court concludes that Eastern's medical insurance program is not conducted in violation of Title VII.

### 2. SICK LEAVE POLICY:

■ With even less diffuseness than utilized in the Court's discussion of the preceding issue, the sick leave issue may be disposed of. Under Eastern's sick leave policy, flight attendants on maternity leave do not receive sick leave pay. The Supreme Court has recently upheld such a policy, however, stating that it was ". . . legally indistinguishable *from the disability insurance program upheld in Gilbert*". *Nashville Gas Co. v. Satty*, 434 U.S. 136, 143, 98 S.Ct. 347, 352, 54 L.Ed.2d 356 (1977). Thus, Eastern's policy of not awarding sick leave pay to pregnant flight attendants does not violate Title VII unless plaintiffs can show that the policy produces a discriminatory effect or that it is a pretext for unlawful sex discrimination. Plaintiffs, in an effort to carry the burden they had in the preceding discussion, resorted to a similar pretext argument, but concede in their post-trial brief that Eastern's sick-leave policy was "inconclusive". As heretofore indicated, reliance solely on Eastern's general history of discrimination against female flight attendants is insufficient to demonstrate unlawful pretext with respect to a specific policy.

The Court accordingly concludes that Eastern's sick leave policy is not violative of Title VII.[5]

### 3. REINSTATEMENT POLICY:

Eastern's reinstatement policy creates a far more complex issue than either of the preceding issues addressed. Eastern guarantees reinstatement to flight attendants on maternity leave only if they return to work within 90 days after delivery, or within 6 months after delivery if additional time is medically necessary. This contrasts sharply with Eastern's policy governing reinstatement following sick leave. Leaves of absence for temporary disabilities other than pregnancy may extend for as long as three years. The method for analyzing such unevenly applied reinstatement policies was explained by the Supreme Court in *Nashville Gas Company v. Satty, supra.*

In *Satty*, the Supreme Court considered a Title VII challenge to a facially neutral leave of absence policy under which employees returning from mandatory pregnancy leave were deprived of all accumulated seniority, whereas employees returning from leave for any other type of disability were permitted to retain their accumulated seniority. Both the district court and the court of appeals held that such a policy violated § 703(a)(2) of Title VII, 42 U.S.C. § 2000e–2(a)(2), which makes it unlawful for any employer to:

> . . . limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . .

The Supreme Court affirmed. It was "beyond dispute", the Court stated, that *Nashville* Gas Company's policy of depriving employees returning from pregnancy of their accumulated seniority acted both to deprive

---

5. It is inconsequential that sick leave pay carries with it certain peripheral benefits (such as pleasure travel privileges and group insurance coverage) not available to flight attendants on maternity leave. As plaintiffs have failed to show that sick leave benefits as a whole are distributed in a sexually discriminatory manner, it makes no difference under § 703(a)(1) of Title VII whether the sick leave package is large or small.

them of employment opportunities and to affect their status as employees.[6]

The Supreme Court rejected any suggestion that its holding in *General Electric Co. v. Gilbert, supra,* validated Nashville Gas Company's policy:

> Here, by comparison, petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer.
>
> . . .

434 U.S. at 142, 98 S.Ct. at 351. While *Gilbert* did hold that Title VII did not require employers to bestow greater economic benefits upon women than men simply because only women could become pregnant, the *Gilbert* holding did not authorize employers ". . . to burden female employees in such a way as to deprive them of employment opportunities because of their different role". 434 U.S. at 142, 98 S.Ct. at 351 (footnote omitted).[7]

The Supreme Court qualified its reading of § 703(a)(2) however by stating that pregnancy leave policies burdensome to women did not violate Title VII if justified by "business necessity". Petitioner in *Satty* had not shown that its policies were justified by any business necessity, and the Supreme Court considered it fair to assume that no justification existed. The policies were therefore held to violate Title VII.

The teachings of *Nashville Gas Co. v. Satty* were distilled by the United States Court of Appeals for the Fourth Circuit in *Pennington v. Lexington School District 2,* 578 F.2d 546 (4th Cir. 1978) (Butzner, J.). In that case, the Court considered the School Board's policy which denied teachers on maternity leave reinstatement until the beginning of the next school year. The evidence disclosed that teachers on leaves of absence for disabilities other than pregnancy were normally reinstated during the current school year when their health permitted. Quoting from *Nashville Gas Co. v. Satty,* the Court of Appeals found the school board had ". . . imposed on women a substantial burden that men need not suffer. . . ." The Court therefore held that the school board's policy violated Title VII unless it could be justified by business necessity.[8]

The central principle of *Nashville Gas Company v. Satty* and *Pennington v. Lexington School District 2* is in the Court's view clear: If an employer's policy governing reinstatement following maternity

---

**6.** The Court is well aware that Eastern, unlike Nashville Gas Company, does not deprive employees returning from pregnancy leave of their accumulated seniority. Indeed, Eastern allows flight attendants to continue accruing seniority while on maternity leave. The issue is not simply seniority; it is reinstatement. With respect to reinstatement, the effects of Eastern's policy can be as harmful as Nashville Gas Company's policy. The essence of Ms. Satty's complaint against Nashville Gas was that the policy made it difficult for her to regain a permanent position with the company following maternity leave. An Eastern flight attendant unable to return from maternity leave within the specified time limits might similarly find it difficult, perhaps impossible, to regain her position as a flight attendant. It obviously makes no difference to an employee returning from maternity leave whether she is denied reinstatement to her former position because her employer has taken away her seniority or because her employer has imposed a time limit which she is physically unable to meet.

**7.** The omitted footnote reads, in relevant part, as follows:

**4.** Our conclusion that petitioner's job seniority policies violate Title VII finds support in the regulations of the Equal Employment Opportunity Commission (EEOC). The 1972 Guidelines of the EEOC specify that "written and unwritten employment policies and policies involving . . . the accrual of seniority . . . *and reinstatement* . . . shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities." 29 CFR § 1604.10(b) [Emphasis added]. [Ellipsis in original.]

The Court stated that the quoted guideline was entitled to some weight because it was "fully consistent with past interpretations of Title VII by the EEOC" and because no conflicting opinions of other Federal agencies regulating sex discrimination had been brought to the Court's attention.

**8.** Since the district court had not fully addressed the question of business necessity, the court of appeals remanded the case for decision on that issue.

leave is substantially more burdensome than the policy governing reinstatement following leave for other temporary disabilities, the increased burden on women must be justified by business necessity. If business necessity is not shown, the maternity leave reinstatement policy violates § 703(a)(2) of Title VII.

Applying this principle to the instant case, the initial question is whether Eastern's maternity leave reinstatement policy is substantially more burdensome than its sick leave reinstatement policy. In responding to this query, it is important to bear in mind that Eastern's maternity leave reinstatement policy affects pregnant flight attendants very differently depending on how soon they recover after delivery.

As to those flight attendants on maternity leave who are able to work again within 90 days after delivery, plaintiffs have not shown that Eastern's reinstatement policy imposes any substantial restriction not imposed on employees returning from sick leave. Indeed, in some respects Eastern's maternity reinstatement policy may be more generous than its sick leave reinstatement policy; flight attendants on maternity leave may remain on leave for up to 90 days after delivery, even if they are fully recovered prior to the expiration of that time, whereas flight attendants on sick leave presumably must return to work as soon as they are physically able.

Nor does Eastern's policy substantially burden those flight attendants who recover more than 90 days but less than 6 months after delivery. They, too, are guaranteed reinstatement in the same manner as those returning from sick leave. The only difference is that flight attendants on maternity leave must show medical necessity in order to remain on leave beyond 90 days after delivery, while it has not been suggested that this is a substantial burden.

For flight attendants physically unable to return from maternity leave until more than 6 months after delivery, however, the Court finds that Eastern's maternity leave reinstatement policy is indeed substantially more burdensome than its sick leave reinstatement policy. If pregnancy were treated like any other temporary disability under Eastern's policy, flight attendants could remain on maternity leave up to three years, if medically necessary, without losing their right to reinstatement. Under the challenged policy, in contrast, flight attendants lose their right to reinstatement if they remain on maternity leave for more than six months even if it is medically determined that it is necessary for them to do so. In the Court's view, Eastern has thus ". . . imposed on women a substantial burden that men need not suffer . . . ." *Nashville Gas Co. v. Satty, supra,* 434 U.S. at 142, 98 S.Ct. at 351. As Eastern has not shown any business necessity for imposing this substantial burden, the Court concludes that Eastern's six month time limit on guaranteed reinstatement following childbirth violates § 703(a)(2) of Title VII.[9]

### 4. TRANSFER POLICY:

For similar reasons, Eastern's policy of stripping accumulated seniority from pregnant flight attendants transferred to ground positions also violates Title VII. Pregnancy is the only temporary disability singled out in this manner. Flight attendants experiencing temporary disabilities or illnesses other than pregnancy are permitted to transfer to ground positions, subject to job availability, without losing accrued seniority. Because Eastern's policy forces pregnant flight attendants to choose between transfer and seniority, it tends to

---

**9.** As in *Pennington v. Lexington School District 2, supra,* a trial on all issues was conducted prior to the Supreme Court's decision in *Nashville Gas Co. v. Satty.* If *anything,* the Court of Appeals remanded on the issue of business necessity so that the parties would ". . . have the opportunity to initially litigate the question in the district court in light of *Satty,* reopening the record, if necessary, for the introduction of additional evidence." at 549. In the instant case, both parties have been well aware of the *Satty* decision and there having been no request for the introduction of additional evidence, the Court deems it appropriate to decide the issue of business necessity on the record in hand.

deprive flight attendants of employment opportunities and affects their status as employees. The policy thus violates § 703(a)(2) of Title VII unless justified by business necessity. *See Nashville Gas Co. v. Satty, supra; Pennington v. Lexington School District 2, supra.*

 Eastern has advanced no such business necessity. Its only asserted justification for the transfer policy governing pregnant flight attendants is that the policy is contained in the collective bargaining agreement. Such contention is neither legally sufficient or a source of solace to those affected thereby. The unadulterated fact is that Eastern's policy violates Title VII. The fact that the Union and the company agree upon the policy is of no consequence considering its unlawfulness. *See e. g. Weber v. Kaiser Aluminum and Chemical Corp.*, 563 F.2d 216 (5th Cir. 1977), *rehearing denied*, 571 F.2d 337 (1978).

## 5. MANDATORY MATERNITY LEAVE POLICY:

Plaintiffs' most critical challenge is to Eastern's mandatory maternity leave policy. Eastern's stated policy is to require flight attendants to cease flight duties as soon as they learn they are pregnant. Once again, this policy is far more stringent than Eastern's policy governing leave for other types of physical conditions. Eastern maintains no overall policy specifying those physical conditions which require a flight attendant to cease flight duty. The physical ability to perform flight duties is a matter normally left to the good judgment of each individual flight attendant. Pregnancy constitutes the sole exception to this common sense approach. Since pregnancy is confined to women, it follows that only women are automatically and involuntarily precluded from employment due to a physical condition. Once more invoking *Nashville Gas Co. v. Satty, supra,* the Court concludes that Eastern's mandatory maternity leave policy ". . . imposed on women a substantial burden that men need not suffer . . ." 434 U.S. at 142, 98 S.Ct. at 351. This establishes a prima facie case of sex discrimination and the policy is thus violative of § 703(a)(2) of Title VII unless Eastern can justify the policy by "business necessity" or unless Eastern can bring the policy within the scope of the "bona fide occupational qualification" (BFOQ) exception of § 703(e) of Title VII.[10] Because ". . . it is imperative not to confuse the two defenses . . ." Schlei and Grossman, *Employment Discrimination Law,* 292, (1976), the Court will consider the business necessity and BFOQ defenses separately.[11]

**10.** Section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e) provides, in pertinent part, as follows:

(e) Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . .

**11.** Because § 703(e) is an exception to all other provisions of Title VII, it is not entirely clear

whether Eastern's maternity leave policy should be tested under the "business necessity" test or the BFOQ test, or both. In *Condit v. United Air Lines, Inc.*, 12 E.P.D. ⸤ 11,195 (E.D.Va. Sept. 3, 1976), *aff'd.*, 558 F.2d 1176 (4th Cir. 1977), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978), the District Court proceeded directly to the BFOQ test, and the Court of Appeals affirmed on that basis. Likewise, the Court in *In re National Air Lines, Inc.*, 434 F.Supp. 249, (S.D.Fla. 1977) by-passed the business necessity test, going directly to the BFOQ analysis. A different approach was taken in *Harriss v. Pan Am World Airways, Inc.*, 437 F.Supp. 413, 432–35 (N.D.Cal. 1977), in which the Court lumped the business necessity and BFOQ analysis together under a single heading.

All of those cases, however, were decided prior to the Supreme Court's decision in *Nashville Gas Co. v. Satty, supra. Satty* indicates that a Court analyzing a maternity leave policy should first apply the business necessity test. However, even if the employer's policy fails the

The classical formulation for "business necessity" is articulated by the late Judge Sobeloff in the context of racial discrimination in *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir. 1971):

> . . . The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. [Footnotes omitted.]

This formulation has continuing validity and has been advanced by the Court of Appeals for the Fourth Circuit in cases involving sex discrimination. *See Pennington v. Lexington School District 2, supra.* The Court is satisfied from the evidence that Eastern cannot satisfy this test.

Eastern rests its mandatory maternity leave policy on two distinct bases. The first is Eastern's concern for the health and welfare of pregnant flight attendants and their unborn children. The second basis is Eastern's concern for the safety of its passengers.

▇▇▇▇ The first basis is inadequate because Eastern does not have a sufficiently compelling business interest in the health of its flight attendants to override the discriminatory impact of its policy. Eastern's business is transportation by air, not maternity care. Whether or not a woman must cease work for health reasons during the first trimester of her pregnancy is a decision for the woman and her doctor, not the employer. *Cf., Planned Parenthood of Missouri v.*

*Danforth*, 428 U.S. 52, 61, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (during first trimester, abortion decision must be left to medical judgment of woman's attending physician, without state interference). Even if Eastern did have a compelling business purpose of protecting the health of its *flight* attendants and their unborn children, the leave-upon-knowledge policy still would not pass the business necessity test because there are acceptable alternatives which would accomplish that purpose equally well with a lesser impact upon women. The most creditable medical testimony before the Court indicates that the work environment and responsibilities of a flight attendant do not increase the otherwise normal risks of pregnancy. Eastern's evidence to the contrary was in the Court's view entirely speculative and is not credited by the Court.

▇▇▇ Nor can Eastern's leave-upon-knowledge policy be justified by Eastern's concern for the safety of its passengers. The Court has no doubt, of course, that passenger safety is a sufficiently compelling business purpose to override some sexually discriminatory impact. It is also clear from the evidence that at some point pregnancy hinders flight attendants in the adequate performance of their duties and thus compromises the safe and efficient operation of the aircraft. Once again, Eastern has not chosen the least restrictive alternative. The evidence established to the Court's satisfaction that virtually all pregnant flight attendants can perform their jobs in the same manner for many weeks after they learn of their pregnancy, as they performed their tasks prior thereto. Thus, Eastern could accomplish its purpose of assuring passenger safety "fully well with a lesser differential [sexual] impact" by setting a later date for mandatory maternity leave. Eastern's leave-upon-knowledge policy therefore fails the business necessity test as

business necessity test, and thus violates § 703(a)(2) of Title VII, it is clear to this Court that the policy may nevertheless be lawful if it passes the BFOQ test under § 703(e), because § 703(e) itself explicitly states that it is available "[n]otwithstanding any other provision of" Title VII.

Accordingly, the Court deems it appropriate to first apply the business necessity test, then the BFOQ test. As a practical matter, however, the Court sees little difference between the two tests.

set out in *Robinson v. Lorillard Corp., supra*, and consequently violates § 703(a) of Title VII. That conclusion however, is not the end of the question, for despite this violation of § 703(a), the leave-upon-knowledge policy may nevertheless be lawful if it satisfies § 703(e) of Title VII. That section permits an employee to enforce a sexually discriminatory policy ". . . in those certain instances where . . . sex . . . is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of that particular business or enterprise . . ." 42 U.S.C. § 2000e–2(e). Thus, Eastern's leave-upon-knowledge policy may be lawful if Eastern could show that non-pregnancy is a BFOQ for flight attendants.

█ The proper standard for determining whether a particular policy establishes a BFOQ was stated by the United States Court of Appeals for the Fourth Circuit in *Arritt v. Grisell*, 567 F.2d 1267 (4th Cir. 1977). Adopting the two-prong test formulated in *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir. 1976), the Court stated that an employer asserting a BFOQ defense has the burden of showing (1) that its policy ". . . is reasonably necessary to the essence of its business . . .", and that (2) the employer has ". . . a factual basis for believing that all or substantially all persons within the class . . . would be unable to perform safely and efficiently the duties of the job involved, or that it is impossible or impractical to deal with persons . . . on an individualized basis. . . ." 567 F.2d at 1271. Although adopted in the context of age discrimination, this standard appears to be appropriate in cases involving sex discrimination.[12]

In applying the *Arritt v. Grisell* standard, the Court must bear in mind the Supreme Court admonition ". . . that the bfoq exception was in fact meant to be an ex-

tremely narrow exception to the general prohibition of discrimination on the basis of sex . . ." *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977) (footnote omitted).

As under the business necessity test, Eastern cannot rest its BFOQ defense on its concern for the health and welfare of flight attendants and their unborn children. Such concerns are laudatory, but do not touch upon the essence of Eastern's business. Moreover, to the extent that such concerns are valid, Eastern has not shown that the health of all pregnant flight attendants is threatened by continued flight duties, or that it is impractical or impossible to assess the health risks of continued flying on an individual basis. Indeed, the evidence is to the contrary.

█ Eastern's contention that its policy is justified by safety consideration fares little better. Although the Court fully agrees that mandatory maternity leave from flight duty "is reasonably necessary to the essence of its business" at *some* stage of pregnancy, the Court is satisfied that Eastern does not have a factual basis for believing that all or substantially all pregnant flight attendants are unable to perform their jobs safely or efficiently, or that it is impossible or impractical to determine on an individual basis which flight attendants can and which cannot so perform. The evidence is clear that most flight attendants can perform safely and efficiently for some time after they learn they are pregnant, and that it is possible and practical to determine individually which pregnant flight attendants may not be able to perform their assigned duties adequately due to pregnancy. The Court is therefore of the view that non-pregnancy is not a bona fide occupational qualification for a flight attendant, and that Eastern's leave-upon-knowledge maternity policy violates Title VII.

---

**12.** The *Usery* formulation was based on constructions of the BFOQ exception in two Title VII sex discrimination cases. *See Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971); *Weeks v. Southern Bell Telephone and Telegraph Co.*, 408 F.2d 228, 235

(5th Cir. 1969). Moreover, the language of the BFOQ exception under the Age Discrimination in Employment Act of 1967 is essentially the same as the language of the BFOQ exception under Title VII. Compare 29 U.S.C. § 623(f)(1) with 42 U.S.C. § 2000e–2(e).

These legal conclusions merit a detailed factual explanation. Pregnancy is an evolving rather than a static condition, and the Court will assess the ability of pregnant flight attendants to perform safely in the context of the various stages of pregnancy.

Prior to the onset of abdominal expansion and increased girth, there is nothing in pregnancy *per se* which impairs a flight attendant's ability to work. The parade of so-called "side effects" of pregnancy—morning sickness, fatigue, back strain and the like—do not generally result in incapacitation. The evidence is overwhelming that these conditions do not affect the performance of a flight attendant. Eastern itself acknowledges that a vast majority of its pregnant flight attendants continue to work through their first trimester of pregnancy, the period when most of these problems are most severe. TWA, National and other airlines have indicated similar experiences. Yet Eastern could not document a single instance where pregnancy adversely affected a flight attendant's job performance.[13] Similarly, Northwest Airlines, which for years has permitted pregnant flight attendants to work through the second trimester upon a doctor's approval, has experienced no difficulty whatsoever.

Even should the consequences of pregnancy prove to be abnormally troublesome for some individuals, it cannot be said that those individuals cannot be identified. A flight attendant knows at any given time whether she is experiencing extreme fatigue or morning sickness. Indeed, it is often these very symptoms which first alert a woman to the possibility that she may be pregnant. There is no evidence of any kind that pregnant women who are physically unable to work will act less responsibly in reporting their problems than workers suffering from adverse physical conditions unrelated to pregnancy.

The Court has carefully scrutinized the evidence as to miscarriages and premature deliveries. Miscarriages beyond the sixth week of pregnancy and all premature deliveries are disabling. Most miscarriages occur during the first thirteen weeks of pregnancy—a time during which Eastern admits its pregnant flight attendants continue to work. Should either of these contingencies occur, a flight attendant could not perform her normal operational or emergency duties. A great preponderance of evidence reflects, however, that at any given time during an individual woman's pregnancy, the onset of a miscarriage or premature delivery is predictable prior to the actual disablement. While it may not be possible as a general proposition to predict which women will miscarry during pregnancy, it is possible, with considerable accuracy, for an individual woman to determine whether she is likely to miscarry within the time it takes to complete a given flight. Thus, if a woman is not exhibiting warning symptoms, such as spotting, when she boards a six to eight hour flight, there is little chance that she will become disabled before the flight is concluded.[14]

In summary, for the first twenty weeks following inception, a pregnant flight attendant suffering no complications can perform her duties—both normal and emergency—as well as she could in a non-pregnant state. She is able to open emergency escape exits, deploy life boats, give evacuation instructions and directions, carry children, perform first aid, and tend to the less demanding routine of a normal flight. The Obstetrics and Gynecology Department of

13. Eastern did bring to the Court's attention one instance of a flight attendant who took herself off of a flight sequence due to hemorrhaging. She subsequently suffered an abortion. There was evidence, however, to the effect that that particular flight attendant was conscious of difficulties prior to boarding the flight, in that she had been spotting.

14. While it has not been brought to the Court's attention as to whether Eastern operates any flights which consume more than six hours from boarding to landing, the evidence does indicate that a pregnant flight attendant might be unable to determine whether she might become disabled before the completion of her flight or flight sequence in the event Eastern does operate such flights. The Court deems it appropriate therefore to conclude that non-pregnancy is a BFOQ with respect to flights of more than six hours duration.

the Mayo Clinic has found no reason why a pregnant flight attendant cannot continue to work through this stage of her pregnancy. The experience of TWA, Northwest, and indeed even Eastern, supports this conclusion. With the exception of miscarriages and premature deliveries, there is no reason why the adverse consequences of pregnancy cannot be subject to the same policy as all other physical conditions. That is, the determination as to whether the condition warrants not flying should be left to the good sense of the flight attendant. The occurrences of miscarriages and premature deliveries are sufficiently predictable to allow such a policy without compromising safety.

The Court also finds that as of the twenty-eighth week of pregnancy, virtually all pregnant flight attendants should discontinue working as flight attendants. There was complete agreement among the experts that during this late stage of pregnancy a flight attendant's decreased agility would render her less able to react quickly in an emergency. As substantially all pregnant flight attendants would be unable to perform their duties past the twenty-eighth week of pregnancy, Eastern's mandatory maternity leave policy is justified from that time on.

██ Accordingly, the Court concludes that being less than twenty-eight weeks pregnant is a bona fide occupational qualification for being a flight attendant.

The period between the twentieth and twenty-eighth week of pregnancy involves abdominal expansion and fetal growth occurring at individual rates. The Court is satisfied that ". . . the ability of any particular pregnant woman to continue to work . . ." during this period ". . . is very much an individual matter." *Turner v. Dept. of Employment Comm'n.*, 423 U.S. 44, at 46, 96 S.Ct. 249, at 250, 46 L.Ed.2d 181, *quoting Cleveland Bd. of Education v. LaFleur,* 414 U.S. 632, at 645, 94 S.Ct. 791, at 799, 39 L.Ed.2d 52. Those pregnant flight attendants who have developed to the point where their agility and efficiency is significantly decreased can

be identified. Those who have not developed to that point are entitled to continue work.

██ In summary, Eastern's blanket policy that pregnant flight attendants must cease flight duties cannot be justified in law or in fact, either as a business necessity or a BFOQ.

██ But even if Eastern's mandatory maternity leave policy could be justified as a business necessity or BFOQ, the Court is persuaded that the policy would nevertheless violate Title VII because, in the Court's view, Eastern's purported justifications for the policy are ". . . mere pretexts designed to effect an invidious discrimination . . ." against women. *Nashville Gas Co. v. Satty, supra,* 434 U.S. at 145, 98 S.Ct. at 353, 54 L.Ed.2d at 366 quoting *General Electric Co. v. Gilbert, supra,* 429 U.S. at 135, 97 S.Ct. at 407, 50 L.Ed.2d 343.

The Court simply does not believe that Eastern's mandatory maternity leave policy has its genesis in a concern for the safety for its passengers. A more realistic assessment of the policy's origin requires a historical perspective. The evidence before the Court demonstrates a clear and continuing pattern of sex discrimination on the part of the defendant. Eastern refused to hire married flight attendants until January 1, 1973. Although this policy was applicable to both men and women, its impact fell most heavily on women because from 1958 or 1959 until 1973, Eastern hired only female flight attendants. Thus, for almost 15 years, Eastern's "single-only" hiring policy affected only women. During this period, pilots and other male Eastern in-flight employees were permitted to marry and continue working. Women were not afforded this privilege until 1965. Even then flight attendants who became pregnant prior to 1970 were subject to termination. Fatherhood carried no such penalties.

It is thus readily apparent that Eastern has erected barriers to employment applicable to women but not to men who desire both a career and a family. It is the purpose of Title VII to eliminate such barriers which are premised on the ". . . an-

cient canards about the proper role of women . . ." *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 545, 91 S.Ct. 496, 498, 27 L.Ed.2d 613 (1971) (Marshall, J., concurring). In this light, it would be entirely unrealistic to assume that Eastern's mandatory maternity policy is the product of reasoned decision concerning safety. It is precisely the type of policy Judge Craven had in mind when he wrote: ". . . There is much to be said for old fashioned motherhood; but, we think, it is better said by women than by [an employer] in the form of an inflexible regulation based on a false and irrational premise . . ." *Cook v. Arentzen*, 582 F.2d 870 (4th Cir. 1977). *Vacated on rehearing on other grounds* (1978). Eastern's policy, in short, is the remnant of a historical pattern of discrimination based on antiquated assumptions about the role of women, family and employment. Such ". . . general policy and practice with respect to minority employment . . ." is relevant to a discussion of pretext. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–05, 93 S.Ct. at 1825 (footnote omitted).

Eastern's laxity in enforcing its mandatory maternity leave policy also indicates that its concern for safety in that regard is confined to the courtroom. Despite actual knowledge that flight attendants routinely continue to work through the third month of pregnancy, Eastern has yet to make the slightest effort to enforce its policy. A simple comparison of claims filed for maternity benefits with the date a flight attendant commenced maternity leave would in most cases reveal whether or not a given flight attendant had complied with the policy. No such comparison has ever been made by Eastern.

The mandatory maternity leave policy, moreover, is inconsistent with the great weight of medical opinion, as illustrated by the position of the American College of Obstetricians and Gynecologists. Nor are there any FAA regulations which require such a policy or even suggest that it is advisable.[15] Eastern's policy was pursued in the complete absence of any medical support. Eastern's entire medical defense was assembled *after* the commencement of litigation. Such after the fact justification smacks of the type of pretext alluded to in *McDonnell Douglas Corp. v. Green, supra.*

Going beyond pregnancy, Eastern's general practices belie the notion that it is acutely concerned about the physical condition of its flight attendants. There are no regular periodic physical exams for any flight attendants, male or female. At no time does Eastern attempt to measure the agility, strength or quickness of its flight attendants. There are no written standards as to when a flight attendant should not fly because of a physical difficulty. This background contrasts starkly with that presented in *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859 (7th Cir. 1974) and *Usery v. Tamiami Trail Tours, Inc., supra.* In those cases, the employers' genuine concern for the physical fitness of their drivers was demonstrated by rigorous enforcement of their safety standards. Here, such evidence is woefully lacking.

Finally, the Court must consider the fact that Eastern has adopted the most restric-

---

**15.** In fact, the FAA has on several occasions expressed its marked disapproval of policies such as Eastern's. The case of *Pan American World Airways, Inc. v. Marshall,* 439 F.Supp. 487 (S.D.N.Y. 1977) for example, details Pan Am's struggle for a preliminary injunction after the FAA had determined that Pan Am's maternity leave policy—a policy nearly identical to Eastern's—violated an FAA anti-discrimination regulation by imposing "a penalty for childbearing." In *Maclennan v. American Airlines, Inc.,* 440 F.Supp. 466, 471 (E.D.Va. 1977), another suit challenging mandatory maternity leave upon knowledge of pregnancy, the Court quoted the following portion of a January 31, 1977 letter from Dr. H. L. Reighard, a Federal air surgeon:

"[W]e feel that a pregnant woman with no complications is in good health. The consideration of whether a flight attendant should fly when pregnant continues to be a matter between herself, her doctor and her employer."

FAA's refusal to endorse a mandatory maternity leave policy such as Eastern's has considerable significance when the FAA's statutory duty to assure aircraft safety is taken into account.

tive policy. When a plaintiff shows that alternative policies equally serve an employer's legitimate interests without a similarly undesirable sexual impact, "[s]uch a showing would be evidence that the employer was using [the practice] merely as a 'pretext' for discrimination . . ." *Albermarle Paper Co. v. Moody, supra*, 422 U.S. at 425, 95 S.Ct. at 2375. The experience of other airlines indicates that there is no conflict between early stages of pregnancy and the safe and efficient performance of a flight attendant. Indeed, such has been the experience of Eastern itself. Dr. Serrano, Eastern's Medical Director, admitted as much in his letter dated December 13, 1973. Despite this, Eastern continues to maintain a policy which maximizes economic hardship on women. This policy contrasts with the position taken towards non-sex-linked conditions such as diabetes and epilepsy. For these conditions, which are not sex-linked, Eastern makes individualized determinations as to the fitness to fly as opposed to the blanket prohibition applicable to pregnancy.

Given Eastern's history of hostility towards working women with families, the total lack of enforcement of its policy, the lax approach towards physical fitness generally, and the severity of the exclusion for pregnancy compared to sex-neutral physical infirmities, the conclusion is compelled that Eastern's safety rationale is a mere pretext for invidious discrimination against women.

Two additional observations must be made concerning Eastern's defense. Eastern's policy, as it presently operates, affects two vitally important interests of all persons. First, Eastern's policy penalizes "the pregnant [flight attendant] for deciding to bear a child," a decision that involves ". . . one of the basic civil rights of man . . ." *Cleveland Bd. of Education v. LaFleur, supra*, 414 U.S. at 640, 94 S.Ct. at 796, quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Second, Eastern's policy amounts to a temporary but relatively lengthy denial of the opportunity to work, which is not justified by legitimate concerns. As noted by the Supreme Court,

". . . the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915). Title VII represents a national commitment to secure that freedom in the private sector of our economy as well. ". . . What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs v. Duke Power Co., supra*, 401 U.S. at 431, 91 S.Ct. at 853. *Accord, International Brotherhood of Teamsters v. United States, supra; McDonnell Douglas Corp v. Green, supra*, 411 U.S. at 800, 93 S.Ct. 1817; *Albermarle Paper Co. v. Moody, supra*, 422 U.S. at 417–18, 95 S.Ct. 2362. Eastern's mandatory maternity leave policy, unlike a denial of insurance benefits for pregnancy, unnecessarily and directly precludes employment for a fixed duration. As such, this policy cannot stand.

It is also necessary to place Eastern's concern for safety in proper perspective. A flight attendant's disablement, as opposed to the disablement of a pilot or bus driver, does not directly endanger the passengers. An aircraft can function normally and safely even if a flight attendant becomes disabled. Only in an emergency situation does a flight attendant play an active role in safety. Thus, only when a flight attendant's disablement and an emergency situation occur *simultaneously* is a safety problem presented. The evidence does not indicate that the likelihood of such simultaneous occurrence is appreciably increased by a flight attendant's pregnancy. Indeed, Judge Bryan of this court has stated that the likelihood of a safety problem arising from a flight attendant's pregnancy-related disability is "*minimus*". *Maclennan v. American Airlines, Inc., supra*, 440 F.Supp. at 471 (E.D.Va. 1977). The record in the instant case fails to support even that conclusion. Assuming arguendo however, that

there is a minute probability that a pregnant flight attendant's disablement will result in harm to air line passengers, such does not justify the defendant's adoption of the most stringent possible policy regarding pregnant flight attendants. *See Usery v. Tamiami Trail Tours, Inc., supra,* 531 F.2d at 236.

The Court deems nothing in its current conclusions to be in conflict with the holding of the United States Court of Appeals for the Fourth Circuit in *Condit v. United Air Lines, Inc.,* 558 F.2d 1176 (4th Cir. 1977) (*per curiam*) *cert. denied,* 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978). That case involved a Title VII challenge to United Air Line's policy virtually identical to the policy challenged here, that flight attendants must discontinue flying as soon as they become aware that they are pregnant. The District Court found, on conflicting expert testimony, that pregnancy could incapacitate a flight attendant in ways that might threaten the safe operation of an aircraft, and that non-pregnancy was therefore a BFOQ for flight attendants. *Condit v. United Air Lines, Inc.,* 12 E.P.D. ¶ 11,195 (E.D.Va. 1976). The Court of Appeals affirmed, stating:

> The district court's ruling that United's policy is a bona fide occupational qualification is based on findings of fact which, on the evidence presented by this record, are not clearly erroneous. . . .

558 F.2d at 1176–1177. From this language it is clear that the Court of Appeals did not hold as a matter of law that non-pregnancy is a BFOQ for a flight attendant. Indeed, the Court of Appeals did not even express its agreement with the district court's finding of fact in *Condit,* stating only that such findings were "not clearly erroneous." The Court is satisfied that *Condit* is therefore no obstacle to this Court's conclusion in the instant case, based as it is on findings of fact different from those in *Condit.*

Nor is it surprising that this Court's findings of fact should differ from those of the district court in *Condit. Condit* is only one of four courts which have previously held full trials on the merits regarding air line maternity leave policies requiring flight attendants to cease flying upon knowledge of pregnancy. Two of those courts have upheld the requirement of non-pregnancy as a BFOQ, *see Harriss v. Pan American World Airways, Inc.,* 437 F.Supp. 413 (N.D.Cal. 1977); *Condit v. United Air Lines, supra;* two courts have held that non-pregnancy is not a BFOQ, *see Maclennan v. American Air Lines, Inc., supra; In re National Air Lines, Inc., Maternity Leave Practices and Flight Attendant Weight Program Litigation, supra.*[16] The split in the courts is not surprising, for every case must be decided on the evidence presented in that particular case.

### 6. THE UNION:

 What has been said thus far applies only to the defendant Eastern. The Court must still consider the role of the Union. Plaintiffs argue that the Union is guilty of engaging in unlawful employment practices because it signed a heretofore mentioned collective bargaining agreement and failed to take adequate steps to challenge the illegal provisions contained therein. The Court is in accord with this view. The Union acquiesced in the discrimination and never so much as filed a grievance. The Fourth Circuit Court of Appeals has stated:

> The rights assured by Title VII are not rights which can be bargained away—either by a union, by an employer, or by both acting in concert. Title VII requires that both union and employer represent and protect the best interest of minority employees. Despite the fact that a strike over a contract provision may impose economic costs, if a discriminatory contract provision is acceded to the bargainee as well as the bargainor will be held liable.

---

**16.** One other court considered the same issues, but granted summary judgment in favor of the airline without a hearing. *EEOC v. Delta Airlines, Inc.,* 441 F.Supp. 626 (S.D.Tex. 1977). That Court's summary judgment has no persuasive value whatsoever, in this Court's view, because there the Court based it decision on *Condit* and *Harriss,* and failed to consider either *Maclennan* or *In re National Air Lines, supra.*

*Robinson v. Lorillard Corp., supra,* 444 F.2d at 799 (footnote omitted). *See also Russell v. American Tobacco Co.,* 528 F.2d 357, 365–66 (4th Cir. 1975).

Accordingly, the Court concludes that the Union is guilty of unlawful discrimination.

The Court notes, however, that as a practical matter the Union was virtually powerless to alter Eastern's policy. But *cf. Local 194, Retail, Wholesale and Department Store Union v. Standard Brands, Inc.,* 540 F.2d 864 (7th Cir. 1976); *Airline Stewards and Stewardesses Association, Local 550 v. American Air Lines, Inc.,* 490 F.2d 636 (7th Cir. 1973). The policy was in no real sense the product of negotiation. It was unilaterally imposed by Eastern. The Union acquiesced under protest. As of July 2, 1965, the Union faced a number of discriminatory practices imposed by Eastern with respect to women. Female flight attendants at that time stood to lose their jobs if they married or had a child. The Union, in good faith, began to whittle away at these practices in a logical progression. The vigor with which the Union attacked maternity related issues was undoubtedly limited by the absence of support within its general membership.

The Court is aware that back pay awards serve a dual purpose of compensating victims of discrimination and inducing both employers and unions to voluntarily eliminate illegal employment practices. *Albermarle Paper Co. v. Moody, supra,* 422 U.S. at 418, 95 S.Ct. 2362; *Russell v. American Tobacco Co., supra,* 528 F.2d at 366; *Hairston v. McLean Trucking Co.,* 520 F.2d 226, 231 (4th Cir. 1975). In the instant case however, the Union was more than willing to eliminate the illegal practice. It was Eastern and not the Union which insisted on the policy and refused to alter it. The Union initiated the only bona fide efforts to secure for women flight attendants the right to continue working during pregnancy. Under these circumstances, assessment of back pay awards remain against defendant Eastern only. *Johnson v. Ryder Truck Lines, Inc.,* 555 F.2d 1181 (4th Cir. 1977); *Williams v. Norfolk and Western Railway*

*Co.,* 530 F.2d 539, 543 (4th Cir. 1975). Nevertheless, as a signatory to numerous collective bargaining agreements containing sexually discriminatory maternity leave policies, the Union must remain in this litigation as a defendant to the end that appropriate injunctive relief may be awarded. *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 356, n.43, 97 S.Ct. 1843.

## III. RELIEF

The appropriate relief must of necessity vary depending on the particular policy to which any such relief is directed. As a general matter, however, the Court will enjoin the defendants from enforcing the present policies governing reinstatement, transfer and mandatory maternity leave, all of which the Court has held to be violative of Title VII. These policies are to be replaced by policies treating pregnancy in the same manner as all other temporary disabilities, consistent with this memorandum, for purposes of reinstatement, transfer and mandatory leave. To facilitate the development of such new policies, counsel for the respective parties will be ordered to meet and confer within 30 days of this date, to submit to the Court for approval within 60 days of this date such policies as may be agreed upon by all parties. In the event the parties are unable to reach agreement, each party will submit its respective proposal to the Court within the aforementioned 60 days, for the Court's consideration.

Similarly, the parties will be directed to meet and confer within 30 days of this date in an effort to reach agreement concerning appropriate retrospective relief. As these issues may be more complex, the parties will be given 90 days from this date to submit the resulting joint agreements or differences, as the case may be, to the Court for approval or resolution. The parties are advised, however, that the line of demarcation being between prospective and retrospective relief shall be the date of this memorandum, not the date on which final relief is proved, and that all class members shall from this date forward fully benefit

from whatever new policies are eventually developed to replace those herein held invalid. Delay in implementing new policies will therefore benefit no one. Indeed, the administrative inconvenience of awarding appropriate benefits under the new policies will become more complex with the passage of time.

To insure that class members will be protected against unlawful sex discrimination while new policies are being developed, the Court will order the following interim prospective relief:

### A. *Mandatory Maternity Leave Policy*

Eastern may continue to require flight attendants to report pregnancy immediately upon knowledge. Until the end of the first trimester, however, the decision whether or not to continue flight duties shall rest exclusively with the individual flight attendant and her doctor.

During the second trimester, Eastern may play a role in the flight attendant's decision. From the 13th through 20th weeks of pregnancy, Eastern may condition continued flying duties on monthly written permission from the flight attendant's personal doctor.[17] From the 21st through 28th weeks, a period of increasing physical difficulty for most pregnant women, Eastern's role may become more active. During that period, Eastern may condition continued flying duty on weekly written permission from the flight attendant's doctor. The foregoing however is not to be construed as precluding Eastern's right to challenge the particular attendant's job performance. The Court recognizes that medical decision

is no substitute for performance of the responsibilities for which the flight attendant is being paid. Therefore, if at the conclusion of any flight, the captain or crew chief for that particular flight reports in writing that a flight attendant was unable to perform her duties satisfactorily due to pregnancy, Eastern may immediately require that flight attendant to cease flying, regardless of the stage of her pregnancy.[18]

After the 28th week of pregnancy, of course, Eastern may require all flight attendants to cease flight duties.

### B. *Reinstatement Policy*

To bring maternity leave reinstatement policy into a parallel with the general sick leave policy, Eastern and the Union must guarantee reinstatement to a flight attendant on maternity leave for as long as three years following delivery if the flight attendant can demonstrate that her continued absence from work was or is medically indicated. With respect to those flight attendants who cannot show much medical necessity for extended absence, Eastern may continue to limit the period of guaranteed reinstatement to 90 days following delivery.

### C. *Transfer Policy*

Eastern and the Union must henceforth permit pregnant flight attendants to transfer to ground positions, subject to job availability, without loss of in-flight seniority.

The Court reiterates that the relief ordered is interim relief only. The parties may freely agree to modify these interim policies when they meet and confer, in any

---

**17.** Logically, such written permission might be required at approximately the end of the 12th, 16th, and 20th weeks of pregnancy. These dates may, of course, be flexible.

**18.** The Court recognizes that this is a broad power, but it seems to be a necessary one. An important premise of the Court's decision on mandatory maternity leave is that most pregnant flight attendants can predict possible in-flight difficulties and will act responsibly by not flying when the likelihood of such difficulties is relatively high. If a pregnant flight attendant in fact cannot perform her duties because of her pregnancy, obviously she is either unable to

predict her own limitations or is not acting responsibly.

The defendants are cautioned, however, that the Court will not tolerate a systematic abuse of this maternity leave power. If the parties choose to incorporate such a power into their final agreement on maternity leave, presumably they will include some review mechanism or other limitation on same. In the meantime, the Court has no reason to believe that the removal power will be used other than responsibly and within the spirit of the decision in the instant case.

manner not inconsistent with the Court's conclusions of law and facts, and any agreements reached by the parties are to be submitted forthwith to the Court for its approval or disapproval.

Finally, the Court wishes to stress its profound hope that the parties will reach agreement on comprehensive new policies, and will not require the Court to design such policies. The problems of mandatory leave, reinstatement and transfer are highly complex and call for a detailed, pragmatic solution. The parties, not the courts, have the knowledge and expertise to mold the appropriate policies. The Court, as always, stands ready to render such direction as may be appropriate.

An appropriate order shall issue.